UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------- X
:
IN RE: METHYL TERTIARY BUTYL :
ETHER ("MTBE") PRODUCTS :  OPINION AND ORDER
LIABILITY LITIGATION :
------------------------------------------------------- :  Master File No. 1:00-1898
: MDL 1358 (SAS)
This document relates to: : M21-88
:
*Tonneson, et al. v. Sunoco, Inc., et al.*, 03 :
Civ. 8284 :
*Basso, et al. v. Sunoco, Inc., et al.*, 03 Civ. :
9050 :
------------------------------------------------------- X
**SHIRA A. SCHEINDLIN, U.S.D.J.:**

Fort Montgomery is a small hamlet in Orange County, New York with a population of 1,418 people.[1] In 2000, it was discovered that a gasoline additive, methyl tertiary butyl ether ("MTBE"), had contaminated almost fifty private wells in the hamlet. State and private investigations focused on two gas stations near U.S. Route 9 as potential sources of the MTBE contamination: a Sunoco station and a Mobil station. Residents and business owners whose wells

---

[1] *See* U.S. Census Bureau, Fort Montgomery CDP, New York – Fact Sheet, http://factfinder.census.gov (search "Fort Montgomery, New York"). In comparison, Orange County has a population of 376,392. *See* U.S. Census Bureau, Orange County, New York – Fact Sheet, http://factfinder.census.gov (search "Orange County, New York").

1

had been contaminated subsequently sued the gas station owners and their suppliers.[2]

At trial, plaintiffs propose to offer the expert testimony of Gregory R. Langer to testify, *inter alia*, that "the value of plaintiffs' property in the affected area decreased by 15% due to the effective MTBE contamination."[3] Defendants have filed a motion *in limine* to exclude Langer's testimony, arguing that it does not satisfy Rule 702 of the Federal Rules of Evidence because Langer has "failed to follow any professionally accepted – or even discernable – methodology and cannot provide any meaningful support for his conclusion."[4]

For the reasons that follow, defendants' motion is granted.[5]

---

[2] *See generally In re MTBE Prods. Liab. Litig.*, 528 F. Supp. 2d 303, 306-08 (S.D.N.Y. 2007) (discussing the background of this action).

[3] 3/2/07 Expert Report of Gregory R. Langer ("Langer Rep.") at 3.

[4] Memorandum of Law in Support of Defendants' Joint Motion *In Limine* to Exclude the Opinion of Plaintiffs' Expert Gregory R. Langer ("Def. Mem.") at 1.

[5] Defendants also argue that Langer "lacks the qualifications and experience with contaminated property necessary to provide helpful expert opinion testimony" and "his report is riddled with inaccurate data." *Id. See also id.* at 3-5, 12-14. Because I find that Langer's opinion fails to use a reliable method, I do not address these arguments.

2

## II. A SUMMARY OF THE EXPERT REPORT SUBMITTED BY LANGER

Langer has submitted a fifteen-page expert report. It begins with a description of his experience and qualifications,[6] followed by the five opinions that he proposes to testify about. These opinions include:

> 1. Contamination of the exclusive source of drinking water for residents with a chemical such as MTBE, which received widespread local publicity, has a significant impact on the market value of the property.
>
> 2. There is credible evidence that publicity concerning MTBE contamination in Fort Montgomery, New York has materially impacted the ability of residential property owners to sell their homes within a reasonable period of time. When compared to other communities without this problem, the Fort Montgomery area in general and the plaintiffs' property in particular, [sic] was more difficult to sell than it would have been without MTBE contamination.
>
> 3. A reasonable seller of real estate would disclose to any prospective buyer the presence of MTBE contamination in the domestic well servicing the property to be sold. Real estate brokers and lenders would normally receive this information and treat the property differently than if it was uncontaminated.
>
> 4. In my opinion, the value of plaintiffs' property in the affected area decreased by 15% due to the effective MTBE contamination.
>
> 5. In my opinion, [plaintiffs] would have been able obtain [sic] an average market price of $350,000 for each of the 20 interior

---

[6] Langer Rep. at 2-3.

3

units and $360,000 for each of the 8 end unit townhouses in the original development plan.[7]

The next three pages of the report set forth Langer's basis for these opinions. At the beginning of his analysis, Langer states:

> 8. According to the [sic] article in the Appraisal Journal Published [sic] by the Appraisal Institute, there are several methodologies to consider when there is an environmental condition that impacts property values. In this case, Fort Montgomery is a very small town with very few sales so that there is not enough data to model a regression analysis. In those cases it is necessary to provide trend data on sales by sub-markets, sales/list price analysis and days on the market comparisons. These revolve around Multiple Listing Service data. This can be utilized to provide trend data on sales by sub-markets, sales/list price analysis and days on the market comparisons.[8]

However, Langer's report does not identify which article in the Appraisal Journal he has relied upon and an appendix to the report provides two references which are cited verbatim as "USPAP,7/01/06,The Appraisal of Real Property That May be Impacted by Environmental Contamination" and "The Appraisal Journal,10/01, The Effects on an Oil Pipeline Rupture on Single-Family House Prices."[9]

---

[7] Id. at 3-4.

[8] Id. at 6.

[9] Id. at 14.

4

Having concluded "there is not enough data to model a regression analysis," Langer's report compares the real estate market in Orange County and Fort Montgomery. According to Langer:

> 9. The real estate market in Orange County started to accelerate in 2000 with the number of sales increasing beginning in 1998 and average sales price and median prices increasing dramatically starting in 2000. According to the Great Hudson Valley Multiple Listing Service (GHVMLS) sales volume increase at double digit percentage amounts from 2000 through 2004 before slowing down in 2005 before declining in 2006. Average sales prices increased at over 10 percent per year from 2000 to 2005 before increasing a modest 2.9% in 2006. Median prices also increased at over 10 percent per year from 2000 through 2005.
>
> 10. The buyer frenzy was particularly dramatic in the years 2002 through 2004 with more houses actually selling above their list prices. Average days on the market dropped dramatically in 2000 and 2001. Both years decreasing [sic] by over 15 percent and another 10 percent.
>
> 11. The widespread publicity about the MTBE contamination threat in Fort Montgomery, as well as the actual contamination, shows up in several statistics relating to the Fort Montgomery area. In data obtained from the GHVMLS days on the market stayed very high while the rest of the county was decreasing. This was particularly noticeable in 2001 and still in 2002. In 2001 when publicity about the contamination was coming out – the average days on the market shot up 175 days – twice the county average. In 2002 it was 126 days – 50 percent higher than the county.
>
> 12. In 1999 the median price for Fort Montgomery was slightly higher ($147,500) than the county ($144,000) over the next four years. The median price fell dramatically behind the county on a

5

whole to whole. The cumulative percentage increase for the county was 56.2%. For Fort Montgomery the cumulative percentage increase was 44.5%. This was over 10 percent less than the county.

13. The percentage of sale price as compared to list price is an important factor. During the first four years of 2000 [sic] the county figure was 98 percent or higher. During that same period the Fort Montgomery numbers ranged from 91.2% to 96.4%. The 2001 value was particularly low.

14. Based on my review of the plaintiffs' deposition testimony, all of the plaintiffs' [sic] have impaired use of their domestic water supply and concerns about selling or even making improvements to their houses. For example, the need to purchase bottled water, ice, filters, both at the tap and on the well, are additional household expenses that have resulted from the contamination of their wells. Plaintiffs further described impairments in the use of the water supply such as bottled water for both drinking and cooking, taking shorter showers, turning the water off midway through the shower and then back on to rinse, closing their pool [sic], odors in the water (particularly a sulphur odor) especially when the water was hot, odors in the ice cubes, and concerns about complaints from guests. Overall, the expense for water supplies has increased for these plaintiffs causing an increased cost in ownership, and the every day use of water has been impaired causing a loss of use and enjoyment. These are important factors that can effect [sic] the value of these properties.

15. Based on my review of the Expert [sic] of William D. Cain, the plaintiffs' domestic water supply would be impaired by the off-odor and off-flavor of MTBE causing a loss of use and enjoyment.[10]

---

[10] *Id.* at 6-7.

This analysis is followed by a simple application of Langer's conclusion that there was a decrease of fifteen percent in property value to the various properties owned by plaintiffs.[11]

Pages twelve and thirteen of Langer's report provide two tables comparing the sale of homes in Fort Montgomery and Orange County from 1999-2006. The categories of comparison in the first table include (1) average list price, (2) percentage sale price/list price, (3) average days on the market, (4) median price, and (5) percent change of the median price when compared to the previous year.[12] The categories of comparison in the second table include (1) number of units sold, (2) sold volume, (3) percent change of the sold volume when compared to the previous year, (4) average sales price, and (5) percent change of the average sales price when compared to the previous year.[13] Finally, the last two pages of the report contains a two-page appendix of references.

---

[11] *See id.* at 4-11. Langer also opines that two of the properties have suffered a twenty percent diminution in value "because the owner is responsible for providing water to secondary parties." *Id.* at 10 (describing property at 6 Garrison Road, Town of Highlands); *see also id.* at 10-11 (describing property at 1000 US Highway 9W, Town of Highlands). Finally, on April 26, 2007, Langer also submitted an addendum to his report, which simply applied the fifteen percent decrease to three additional properties.

[12] *See id.* at 12.

[13] *See id.* at 13.

## III. LANGER HAS FAILED TO EMPLOY THE SAME LEVEL OF INTELLECTUAL RIGOR THAT CHARACTERIZES AN EXPERT IN PROPERTY APPRAISAL

Rule 702 states:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) *the testimony is the product of reliable principles and methods*, and (3) the witness has applied the principles and methods reliably to the facts of the case.[14]

"There is no one formula for distinguishing reliable and unreliable methods for all experts for the simple reason that there are too many fields in which people may have expertise."[15] Rather, the Supreme Court has explained that a method is reliable if the expert "employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field."[16]

In this case, I am unable to discern any method – much less a reliable method – that Langer used to reach his conclusion that the value of plaintiffs'

---

[14] Fed. R. Evid. 702 (emphasis added).

[15] *In re MTBE*, 2008 WL 1971547, at *11.

[16] *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999).

8

property decreased by fifteen percent because of MTBE contamination.[17] Rather, Langer has merely compiled market data and then offered his conclusions, yet he has failed to explain the relationship between the two.

Much of Langer's opinion contains vague statements or a simplistic description of the market without any analysis. For example, Langer writes: "The percentage of sale price as compared to list price is an important factor . . . . The 2001 value was particularly low."[18] Likewise, he provides a litany of "important factors that can effect [sic] the value of these properties."[19] But nothing in his expert report explains how these factors affect the value of plaintiffs' property in Fort Montgomery except for stating the obvious conclusion that it would better to have property that has not been contaminated with MTBE.

In his most definitive statement, Langer writes:

> In 1999 the median price for Fort Montgomery was slightly higher ($147,500) than the county ($144,000) over the next four years. The median price fell dramatically behind the county on a whole to whole. The cumulative percentage increase for the

---

[17] The party offering the expert must prove by a "preponderance of proof" that the proffered testimony satisfies Rule 702. *Daubert v. Merrell Dow Pharms.*, 509 U.S. 579, 592 n.10 (1993) (citing *Bourjaily v. United States*, 483 U.S. 171, 175-76 (1987)).

[18] Langer Rep. at 7.

[19] *Id.*

9

county was 56.2%. For Fort Montgomery the cumulative percentage increase was 44.5%. This was over 10 percent less than the county.[20]

However, Langer does not explain how he concluded that plaintiffs' retail property declined by fifteen percent when Fort Montgomery's "cumulative percentage increase . . .was over 10 percent less than the county."[21]

Langer has also selectively chosen data to highlight. For instance, Langer writes that:

> In 2001 when publicity about the contamination was coming out – the average days on the market shot up 175 days – twice the county average. In 2002 it was 126 days – 50 percent higher than the county.[22]

At the same time, Langer does not address the fact that for 2001, the median price of the retail property in Fort Montgomery went up 61.2% from $117,500 to $189,500.[23] Given the dramatic increase in price, "the average days on the market" may have "shot up" because sellers were unwilling to negotiate downward on their selling price in such a hot market. Langer does not explain why he highlights the increase in the average days on the market but not the

---

[20] *Id.* at 7.

[21] *Id.*

[22] *Id.* at 6-7.

[23] *See id.* at 12.

10

increase in price in the same year. Yet, "[w]ithout good explanations, courts cannot assess the reliability of any conclusion drawn by an expert, even if he possesses relevant experience."[24]

The ultimate problem with Langer's opinion is not his conclusion but the fact that he fails to identify any methodology and thereby prevents the Court any means by which to assess the reliability of his opinions. "One cannot assess the reliability of reasoning or methodology that is unexplained."[25] As the Supreme Court has explained, "nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert."[26]

Moreover, as defendants point out, under New York law, "[e]very appraisal assignment shall be conducted and communicated in accordance with the following provisions and standards set forth in the 2008-2009 edition of the Uniform Standards of Professional Appraisal Practice."[27] In his deposition,

---

[24] *LinkCo, Inc. v. Fujitsu Ltd.*, No. 00 Civ. 7242, 2002 WL 1585551, at *4 (S.D.N.Y. July 16, 2002).

[25] *Donnelly v. Ford Motor Co.*, 80 F. Supp. 2d 45, 50 (E.D.N.Y. 1999).

[26] *General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

[27] 19 N.Y. Comp. Codes R. & Regs. § 1106.1. *See also* Def. Mem. at 3 n.5.

"Langer testified that he considered Uniform Standards of Professional Appraisal Practice (USPAP) Advisory Opinion 9 relating to the appraisal of contaminated properties."[28]

But nowhere in his report does Langer explain how he followed this advisory opinion or any other aspect of the USPAP or, indeed, any valuation method.[29] For example, according to the advisory opinion, an "extraordinary assumption" is "an assumption, directly related to a specific assignment, which, if found to be false could alter the appraiser's opinions or conclusions."[30] "In developing a real property appraisal, an appraiser must: (f) identify any extraordinary assumptions necessary in the assignment; and (g) identify any hypothetical conditions necessary in the assignment."[31] Langer's report does not identify any such assumptions or conditions.

---

[28] Plaintiffs' Opposition to Defendants' Joint Motion In Limine to Exclude the Opinion of Plaintiffs' Expert Gregory R. Langer at 4.

[29] Because the parties do not discuss whether an expert appraisal of contaminated property *must* follow the USPAP under the Federal Rules of Evidence, or may instead follow another methodology, I do not add address this issue.

[30] USPAP Advisory Opinion 9 (AO-9) available at http://commerce.appraisalfoundation.org/html/2006%20USPAP/ao9.htm.

[31] *Id.*

12

Finally, the "APPENDIX OF REFERENCES," which presumably contains the sources on which Langer based his conclusion, is a jumble of citations lacking any consistent style, making little sense, and rife with errors.[32] For example, the first citation is "Social Science research Network,,2/27/07,Hazardous Waste Sites and Housing Appreciation".[33] The second citation is "United States District Court, 12/5/06,Subpoena in a Civil Case – Re: Methyl Tertiary Butyl Ether Products Liability Litigation".[34] The twenty-sixth citation is "www.mindfully.org,12/12/00, Outrage as a Neighborhood learns that its water is contaminated MTBE . . . ."[35] The forty-fourth and final citation is to "Karen Hertzberger, 7/1/04 & 9/14/04,".[36]

---

[32] The report also contains numerous spelling, punctuation and grammar errors.

[33] Langer Rep. at 14.

[34] *Id.*

[35] *Id.* at 14.

[36] *Id.* at 15.

13

Without belaboring the point, it is obvious that Langer has failed to use "the same level of intellectual rigor that characterizes the practice of an expert in the relevant field."[37] His expert testimony must therefore be excluded.[38]

## IV. LANGER MAY TESTIFY AS A FACT WITNESS

While Langer's expert testimony does not satisfy Rule 702, the statistics that he gathered on retail property in Fort Montgomery and Orange County are relevant to plaintiffs' action. Under Rule 401, "'[r]elevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."[39] Plaintiffs could argue to the jury that they may find, based on all of the evidence, that the sales figure statistics demonstrate that MTBE contamination was a cause of the diminished value of

---

[37] *Kumho Tire*, 526 U.S. at 152.

[38] Langer also appraised the value of each plaintiff's property *absent* MTBE contamination. There was not sufficient information in Langer's report to determine whether his appraisals meet the standard of Rule 702. If plaintiffs wish to supplement their submission to show that Langer used a reliable methodology in his appraisals, the Court would consider allowing him to testify as to his opinion of plaintiffs' property values absent contamination. Defendants shall have one week after receiving plaintiffs' supplemental submission, if any, to notify the Court of their intention to file a motion *in limine* to exclude this testimony.

[39] Fed. R. Evid. 401.

14

plaintiffs' homes.[40] Moreover, presenting such statistics to the jury is not "substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."[41]

If plaintiffs submit the statistics to the jury, Langer may explain how he gathered the statistics. Of course, plaintiffs are cautioned that Langer will not be allowed to testify on how to interpret these statistics or otherwise offer his expert opinion on the effect that MTBE contamination in Fort Montgomery had on the value of plaintiffs' property.

## V. CONCLUSION

Defendants' motion to exclude Langer's expert testimony is granted. The Clerk of the Court is directed to close this motion (docket #1753).

SO ORDERED:

---

[40] *See* Fed. R. Evid. 401 Advisory Committee Note ("Evidence which is essentially background in nature can scarcely be said to involve disputed matter, yet it is universally offered and admitted as an aid to understanding. Charts, photographs, views of real estate, murder weapons, and many other items of evidence fall in this category.").

[41] Fed. R. Evid. 403.

15

Shira A. Scheindlin
                                        U.S.D.J.

Dated:      New York, New York
            June 4, 2008

## -Appearances-

**Liaison Counsel for Plaintiffs:**

Robin Greenwald, Esq.
Robert Gordon, Esq.
Weitz & Luxenberg, P.C.
180 Maiden Lane
New York, New York 10038
Tel: (212) 558-5500
Fax: (212) 344-5461

**Counsel for Plaintiffs:**

Michael D. Axline, Esq.
Tracey L. O'Reilly, Esq.
Miller, Axline & Sawyer
1050 Fulton Avenue, Suite 100
Sacramento, California 95825
Tel: (916) 488-6688
Fax: (916) 488-4288

John A. Sarcone III, Esq.
The Sarcone Law Firm
222 Bloomingdale Road, Suite 302
White Plains, New York 10605
Tel: (914) 686-8200
Fax: (914) 686-8988

**Counsel for Plaintiff Quattrochi:**

Peter Hoffman, Esq.
200 Katonah Avenue
Village Commons East, Second Floor
Katonah, New York 10536
Tel: (914) 232-2242

**Liaison Counsel for Defendants and Counsel for ExxonMobil and on Behalf of Sunoco, Inc. and Sunoco, Inc. (R&M):**

Peter John Sacripanti, Esq.
James A. Pardo, Esq.
McDermott Will & Emery LLP
50 Rockefeller Plaza, 11th Floor
New York, New York 10020
Tel: (212) 547-5583
Fax: (212) 547-5444

**Counsel for Defendant Sunoco, Inc.**

Daniel Krainin, Esq.
Beveridge & Diamond
477 Madison Avenue
New York, New York 10022
Tel: (212) 702-5417
Fax: (212) 702-5450